UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| NORTH AMERICAN SPECIALTY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 4:04CV798 CDP |
| CORRECTIONAL MEDICAL SERVICES, INC. and NORTHLAND INSURANCE COMPANY, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM AND ORDER

Plaintiff North American Specialty Insurance Company seeks a declaratory
judgment that it has no duty to defend or indemnify its insured, Correctional
Medical Services (CMS), for claims made in an Arizona lawsuit brought by
Northland Insurance Company against CMS and some of its nurses. The Northland
suit arises out of Northland's satisfaction of a five million dollar judgment resulting
from CMS' failure to provide adequate medical care to Jose Valdez, an Arizona
prisoner.

Before me are North American's and CMS' cross-motions for summary
judgment. At issue are numerous provisions within the North American policies that
allegedly bar coverage for the claims raised in the Northland suit that relate to the

injury of Jose Valdez.  After thoroughly reviewing these provisions, I find that three

exclusions – the prior notice, prior litigation, and prior demand exclusion clauses –

relieve North American from any duty to indemnify or defend CMS in the Northland

suit.  Accordingly, I will grant summary judgment in favor of North American.

## Background

**1.  The Parties**

This dispute arises from medical treatment provided to Jose Valdez, an

inmate at Arizona's Florence West correctional facility.  Under contract with the

State of Arizona, Correctional Services Corporation (CSC) administered Florence

West at the times relevant to this dispute.  CSC in turn contracted with CMS to

provide health care services to the inmates.

Northland provided professional liability insurance to CSC for its prison

operations.  Pursuant to its agreement with CSC, CMS carried professional liability

insurance for itself and its employees, and at the time of Valdez's injury, PHICO

Insurance Company was CMS' insurance carrier.  In October, 2000, CMS

purchased several professional liability insurance policies from North American.

**2.  The Valdez Suit**

On January 5, 2000, Valdez brought a complaint in Arizona state court

naming the State and CSC as defendants, among others.  Valdez did not name CMS

as a party in this action.  In April of 2000 CSC forwarded a copy of Valdez's

complaint to CMS, along with a written tender of defense and request that CMS

indemnify CSC for any award that could result from the matter.  According to CSC,

all of the individuals that provided the negligent medical care to Valdez were either

employees of CMS or contractors that CMS had hired.  CMS declined to accept

CSC's tender of defense and indemnity.  On July 7, 2000, CSC filed a Notice of

Non-party at Fault with the Arizona state court, alerting the court that CMS "may

have contributed to all or part of the damages alleged in [Valdez's] Complaint."  A

week later, the State of Arizona and the Arizona Department of Corrections, both

defendants in the Valdez lawsuit, requested the Arizona state court to designate

CMS as a non-party at fault.  In late September, 2000, CSC again tendered the

defense of the Valdez suit to CMS.  Again, CMS failed to comply with these

requests.

In December, 2000, both CSC and the State of Arizona filed separate third-

party complaints against CMS.  Soon thereafter, CSC again requested that CMS

defend and indemnify CSC.  Although CMS never accepted CSC's tender of

defense in the Valdez action, CMS's insurer, PHICO, did indicate, via a letter dated

July 27, 2001, that it would "provide coverage to CSC in the [Valdez] case for any

exposure they may have for the actions of the CMS employed nurses or any other

insured under the CMS policy." PHICO, however, was unable to keep its promise. On August 16, 2001, a Pennsylvania court placed PHICO into rehabilitation.

In October, 2001, the Arizona Superior Court entered judgment in favor of Valdez and against the State of Arizona in the amount of $5,000,000.[1] This judgment became final in June, 2003. Northland fully satisfied the judgment on behalf of the State of Arizona.

### 3. The Northland Suit

On February 17, 2004, Northland filed a nine-count complaint against CMS and several of its nurses, among others, for contribution and indemnification; it also brought contract fraud and other claims against CMS.[2] That case is currently pending in the United States District Court for the District of Arizona. Upon receipt of Northland's complaint, CMS and the named nurse defendants tendered the defense of the Northland suit to North American, who denied coverage.

---

[1]Pursuant to the parties' settlement agreement, CSC was dismissed prior to the trial with prejudice. Also, the State of Arizona admitted liability, leaving damages as the sole issue for trial. The third-party complaints against CMS were never tried and were ultimately dismissed without prejudice. No judgment was entered against CMS or its employees.

[2]Northland's Arizona complaint also seeks contribution and indemnity from CMS for a separate, unrelated injury sustained by Blas Casa Perez, an inmate at Arizona's Phoenix West correctional facility. Although North American's complaint in this case seeks a declaration that North American has no liability to Northland for "any of the claims" raised in the Arizona suit, the parties make no other references to the Perez matters. North American's summary judgment motion only seeks relief as to those counts that relate to the Valdez suit.

### 4.  The North American Policies

North American issued four separate policies to CMS – a Health Care

Providers Liability Policy, a primary policy covering only physicians and surgeons,

and two excess policies.  The Health Care Professional Liability Coverage Part of

the Health Care Providers Liability Policy provides, in pertinent part, that North

American agrees:

> to pay on behalf of the insured all sums which the insured shall be
> legally obligated to pay as damages because of bodily injury or
> property damage to which this insurance applies caused by a medical
> incident which occurs on or after the initial effective date stated in the
> Declarations [October 1, 1997], and for which claim is reported to
> Company [North American] during the policy period, arising from the
> practice of the insured's profession as a health care professional.

(Emphasis omitted).  The "policy period" lasted from October 1, 2000 to October 1,

2001.  CMS also purchased an Extended Reporting Period (Tail) Coverage Part

(ERP) from North American which expanded the scope of the above coverage to

include claims that occur between October 1, 1997 and October 1, 2001 that are

reported on or after October 1, 2001.  The ERP defines "claim" as:

> (1)    an express demand for damages arising from a medical incident
> to which this insurance applies; an express demand for damages
> shall be deemed to include a civil action in which damages to
> which this insurance applies are alleged and an arbitration
> proceeding to which this insured is required to submit by statute
> or court rule or to which the insured has submitted with [North
> American's] consent; or

> (2)     an act or omission which the insured reasonably believes will result in an express demand for damages to which this insurance applies.

(Emphasis omitted).

Each of the North American policies are subject to numerous exclusion clauses, several of which are relevant to this dispute.  They read as follows:

This policy does not apply:

(h)     to any claim against an insured:

> (1)     for which the insured is entitled to indemnity and/or payment by reason of having given notice of any circumstance which might give rise to a claim under any other policy or policies;

> (2)     arising from any pending or prior litigation or other proceeding as of the inception date of this policy, as well as all claims or litigation based upon the pending or prior litigation or derived from the same, or essentially the same, facts (actual or alleged) that gave rise to the prior or pending litigation or proceeding; or

> (3)     arising from a demand, summons or other notice received by the insured prior to the effective date of this policy;

(Emphasis omitted).

## Discussion

The standards for summary judgment are well settled. In determining whether summary judgment should issue, the Court views the facts and inferences from the facts in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in its pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). The parties here agree that the material facts set out above are undisputed.

The primary issue raised in this dispute is whether the prior notice, prior litigation, and prior demand exclusions in the North American policy relieve North American of any duty to defend or indemnify CMS for the Valdez-related claims raised in the Northland suit. CMS contends that none of these provisions apply to the facts of this case, or in the alternative, that if there is any doubt as to their interpretation, they must be strictly construed to provide coverage to CMS.

The parties agree that Missouri law controls the interpretation of the North American policies. In Missouri, "[i]nsurance policies are contracts, and the rules of contract construction apply." Arbteritman v. Monumental Life Ins. Co., 878 S.W.2d 915, 916 (Mo. Ct. App. 1994). The primary goal of contract interpretation is to ascertain the intention of the parties and to give effect to that intention. Boyer v. Sinclair & Rush, Inc., 67 S.W.3d 627, 631 (Mo. Ct. App. 2002). When a contract is unambiguous, the language must be given its natural, ordinary, and common-sense meaning, and the entire contract is reviewed to discern the intention of the parties. Id.; Shahan v. Shahan, 988 S.W.2d 529, 535 (Mo. 1999) (en banc). Missouri courts look to standard English language dictionaries to determine the plain and ordinary meaning of terms. Trans World Airlines, Inc. v. Associated Aviation Underwriters, 58 S.W.3d 609, 622 (Mo. Ct. App. 2001).

Whether an insurance policy is ambiguous is a question of law. Martin v. U.S. Fidelity & Guar. Co., 996 S.W.2d 506, 508 (Mo. 1999) (citing Gulf Ins. Co. v. Noble Broadcast, 936 S.W.2d 810, 813 (Mo. 1997)). Ambiguity "exists where there is duplicity, indistinctness or uncertainty in the meaning of the language used in the policy." Haggard Hauling & Rigging Co. v. Stonewall Ins. Co., 852 S.W.2d 396, 399 (Mo. Ct. App. 1993). Where provisions of an insurance policy are ambiguous, those provisions must be construed in favor of the insured. Krombach

v. Mayflower Ins. Co., Ltd., 827 S.W.2d 208, 210 (Mo. 1992) (en banc).  However,

"[c]ourts will not create an ambiguity in order to distort the language of an

unambiguous insurance policy."  Id. (citations omitted).  Likewise, "[a]n ambiguity

does not exist merely because the parties dispute the meaning of the contract."

National Sur. Corp. v. Prairieland Const. Inc., 354 F.Supp.2d 1032, 1037 (E.D. Mo.

2004).

      An insurer seeking to avoid coverage under a policy exclusion bears the

burden of proving the applicability of the exclusion.  Superior Equip. Co., Inc. v.

Maryland Cas. Co., 986 S.W.2d 477, 482 (Mo. Ct. App. 1998).  Although

exclusions are strictly construed against the insured, "clear and unambiguous

language ... is to be given its plain meaning notwithstanding the fact that it appears

in restrictive provisions of the policy."  Jasper v. State Farm Mut. Auto Ins. Co.,

607 S.W.2d 954, 956-57 (Mo. Ct. App. 1994) (citation omitted).

### 1.  The Prior Notice Exclusion

      The North American policies' exclusion h(1) states that the policies do not

apply to any claim against CMS "for which [CMS] is entitled to indemnity and/or

payment by reason of having given notice of any circumstance which might give rise

to a claim under any other policy or policies."  According to North American, the

notice CMS provided to PHICO of the Valdez suit, and PHICO's subsequent

acknowledgment of its duty to indemnify CSC in the Valdez suit, together satisfy the terms of exclusion h(1).

CMS contends that the prior notice referred to in exclusion h(1) must relate to the same claims for which CMS presently seeks coverage. CMS argues that because CMS' prior notice to PHICO only concerned the Valdez suit, this exclusion clause should not apply to the Northland suit. Alternatively, CMS maintains that even if the notice was sufficient, it is not "entitled to indemnity and/or payment" because PHICO is now insolvent.

For several reasons, I find that CMS' prior notice to PHICO clearly falls within the scope of exclusion h(1). First, the plain language of this exclusion does not require the prior notice to be lawsuit-specific. Rather, the prior notice must simply relate to "any <u>circumstance</u> which might give rise to <u>a</u> claim under any other policy." (Emphasis added). The requisite notice, therefore, relates to the circumstance underlying the present claim, not the claim itself.

It is clear from the record that before the effective date of the North American policies, CMS provided PHICO with notice of the circumstances that gave rise to both the Valdez and Northland suits. As early as September, 1999, CMS, via MCMG, notified PHICO of Valdez's injury in a Loss Advisory Form. Additionally, throughout the spring and summer of 2000, PHICO, CMS, and CSC were in

frequent communication concerning the status of the Valdez suit.  While the Northland suit may present different parties, procedural posture, and grounds for relief compared to the Valdez suit, both claims stem from the same medical incident that CMS notified PHICO of in the fall of 1999.

Second, PHICO's insolvency has no bearing on the applicability of this exclusion.  CMS argues that the phrase "entitled to indemnity and/or payment" implies that the insured must have actual success in obtaining indemnity or payment.  Because PHICO is insolvent, CMS contends that it will never be able to recover under the PHICO policy, and thus is not "entitled" to indemnity and/or payment.  I disagree.  To be "entitled to indemnity and/or payment," one need not have received payment.  Instead, in accordance with the definition of the word "entitle," one must only "be furnish[ed] with a right."  Webster's II New Riverside University Dictionary 435 (1988).  Notably, exclusion h(1) does not hinge on what amounts are "recoverable" under other insurance policies.  Cf. Donald B. MacNeal, Inc. v. Interstate Fire & Cas. Co., 477 N.E.2d 1322, 1324 (Ill. Ct. App. 1985) (insurer providing excess coverage above "amounts recoverable" under other policy assumed risk of primary insurer's insolvency).

In this case, CMS provided the necessary notice to PHICO to furnish itself with a right to indemnity under the PHICO policy.  PHICO's July 27, 2001 letter to

CMS confirms this fact by stating that PHICO has agreed to provide coverage to CSC for any exposure that results from the actions of CMS or its employees in the Valdez suit.  Further, even after PHICO was declared insolvent, the insurer still recognized that CSC had the right to make a claim against PHICO's estate.  At its core, the Northland suit seeks the same coverage from CMS that PHICO agreed to provide CSC in the Valdez suit.  Unfortunately for CMS, its entitlement to indemnity under the PHICO policy for claims arising from Valdez's injury is worth little at the moment.  PHICO's unforeseen insolvency, however, does not alter the plain meaning of the phrase "entitled to indemnity and/or payment."  In sum, exclusion h(1) bars coverage for the Northland suit.

### 2.  The Pending and Prior Litigation Exclusion

North American contends that because the Northland suit arises from the Valdez suit, which was pending as of the inception date of the North American policy, October 1, 2000, North American has no duty to indemnify or defend CMS in the Northland suit pursuant to the policies' pending or prior litigation exclusion, exclusion h(2).  In opposition, CMS claims that the only reasonable interpretation of exclusion h(2) requires this Court to qualify the phrase "pending or prior litigation" with "against the insured."  Although the Valdez suit was pending before October 1, 2000, CMS was not named as a party in that action until December, 2000.  Thus,

CMS maintains that exclusion h(2) does not apply. The California Court of Appeals addressed this precise issue in ML Direct, Inc. v. TIG Specialty Ins. Co., 93 Cal.Rptr.2d 846 (Cal. Ct. App. 2000). In ML Direct, the plaintiffs sought a declaratory judgment that their insurer had a duty to defend and indemnify them in a securities fraud class action. In the class action, the plaintiffs were accused of participating in an elaborate stock manipulation and sales scheme. Prior to the inception date of the policy at issue, the National Association of Securities Dealers (NASD) and the Securities and Exchange Commission (SEC) had filed separate actions against several securities dealers involved in the scheme, but not the plaintiffs. The insurer nevertheless argued that because the present claim was based on the prior suits against the securities dealers, the pending and prior exclusion clause applied to bar coverage for the plaintiffs. Id. 142-44.

The court agreed with the insurer and affirmed the trial court's grant of summary judgment in favor of the insurer. The court specifically rejected the plaintiffs' contention that because they were not named parties in the prior suits, the exclusion did not apply. In the end, the court focused solely on the plain language of the exclusion, which only required the present claim to be based on the prior or pending litigation. Because the class action against the plaintiffs was based upon the same securities fraud scheme that gave rise to the NASD and SEC litigation, the

court held that the exclusion applied.  Id. at 852-53.

Although ML Direct is not binding authority on this Court, I find it persuasive on the facts of this case.  Like the exclusion discussed in ML Direct, exclusion h(2) is written in broad, unambiguous terms, which bar coverage for any claim that derives from pending or prior litigation as of October 1, 2000.  The exclusion does not distinguish between litigation "against the insured" and other litigation, nor will I.  See American Family Mut. Ins. v. Peck, 169 S.W.3d 563, 567 (Mo. Ct. App. 2005) ("courts should take care not to create ambiguities where none exist") (citation omitted).  The language only requires that a claim be "based upon" or "derived from" pending or prior litigation.  This requirement is easily satisfied in the present case.  Both the Valdez and Northland suits derive from CMS' failure to provide adequate medical services to Valdez in the spring of 1999.

CMS contends that this Court's failure to read the qualification "against the insured" into exclusion h(2) will lead to the absurd result of barring coverage for claims that arise from prior litigation that the insured may not know exist.  While this may be true in theory, it is not the case in the present action.  As of the inception date of the North American policy, CMS was well aware of the pending Valdez suit, and the potential liability that the suit posed for CMS.  The failure of the parties in the Valdez suit to name CMS as a party by October 1, 2000 was a

mere formality. By that date, CMS had received multiple notifications, as had the Arizona state court, of the liability that the parties sought to impose upon the health care provider. It was only after CMS ignored CSC's repeated requests for CMS to honor its contractual duty to indemnify and defend CSC in the Valdez suit that CSC and the State of Arizona were forced to join CMS as a party. In sum, because the Valdez suit was pending as of the inception date of the North American policy, coverage for its derivative action, the Northland suit, must be denied under exclusion h(2).

### 3. The Prior Demand Exclusion

The North American policy's exclusion h(3) excludes coverage for any claims against CMS "arising from a demand, summons or other notice received by the insured prior to the effective date of this policy." North American contends that the tenders of defense CMS received from CSC regarding the Valdez suit prior to October 1, 2000 and the notices that the State of Arizona and CSC filed with the Arizona state court qualify as "demand" or "other notice" under this exclusion. For the reasons set forth below, I agree.

CMS's appears to argue that "demand, summons or other notice" must be read as the equivalent of a "claim." "Claim," among other definitions provided in the North American policy, is defined as an "express demand for damages." CMS

contends that any act short of an "express demand for damages," or the filing of a lawsuit, fails to qualify as a "demand, summons or other notice." A review of the North American policy as a whole indicates that the parties did not intend "demand, summons or other notice" to have such a limited meaning. First, exclusion h(3) applies to claims which arise out of a "demand, summons or other notice," not to claims which arise out of other "claims." Second, the policy's failure to qualify the term "demand" in exclusion h(3) with the word "express" or the phrase "for damages" indicates that the parties intended exclusion h(3) to be broader than the definition of "claim." See Williams v. North River Ins. Co., 579 S.W.2d 410, 412 (Mo. Ct. App. 1979) (recognizing that where a term is used in one phrase of an insurance contract, its absence in another phrase is significant).

        The North American policy does not define the terms "demand, summons or other notice," so I must give the terms their ordinary meaning. State Farm Fire & Cas. Co. v. Metcalf, by Wade, 861 S.W.2d 751, 755 (Mo. Ct. App. 1993). "Demand" means, among other definitions, "to claim legally or formally." Webster's II New Riverside University Dictionary 360. CSC's tenders of defense to CMS in the spring and summer of 2000 clearly fall within this definition. For example, CSC's September 25, 2000 letter to CMS reads, in part:

        As you can see, all of [Valdez's] claims against CSC are based upon

the actions of the nurses employed by CMS. Once again, we renew
our request that CMS accept the tender of this defense, for clearly
there is no action of CSC or any of its employees that is the subject of
this litigation.

As is evident from the text of this letter, CSC's tenders of defense did not simply

provide CMS with knowledge of the Valdez suit. They constituted formal

assertions or claims to CSC's contractual right to indemnification and defense.

Thus, they fall squarely within the plain meaning of "demand."

Additionally, should there be any doubt whether these tenders of defense

constitute "demands," I agree with North American that they clearly fall within the

plain meaning of "other notice." CMS contends that "other notice" must be

construed to be like or similar to a demand or a summons under the principal of

ejusdem generis. This principal provides that where general words follow particular

ones, the general ones must be limited in their meaning to things of like kind and

nature as those particularly specified. Jackes-Evans Mfg. Co. v. Christen, 848

S.W.2d 553, 555 (Mo. Ct. App. 1993) (citations omitted). Ejusdem generis,

however, does not trump the cardinal rule of contract interpretation: ascertaining the

intention of the parties. Id. In this case, for the reasons listed above, the parties did

not intend for the phrase "demand, summons or other notice" to be limited to the

filing of a lawsuit. Consistent with that intention, I find the tenders of defense and

notices that CMS received prior to October 1, 2000 to constitute "other notice." In each of these documents, CMS was informed, in no uncertain terms, of CSC's intent to hold CMS responsible for the fact that the negligence of its own employees or independent contractors was directly responsible for Valdez's injury.

Finally, for many of the reasons discussed above, I find that the Northland suit arises from CSC's tenders of defense. In these tenders of defense, CSC formally requested CMS to accept responsibility for the role it played in Valdez's injury, and to honor its contractual commitment to indemnify and defend CSC in the Valdez suit. The Northland suit is the direct result of CMS' failure to comply with CSC's requests. See Capitol Indemnity Corp. v. 1405 Assocs., Inc., 340 F.3d 547, 550 (8th Cir. 2003) (recognizing that Missouri courts interpret the phrase "arising out of" very broadly to require nothing more than a "simple causal relationship" between two events) (citation omitted). In sum, the Northland suit arises from the written demands that CMS received from CSC prior to the effective date of the North American policy. Accordingly, the prior demand exclusion bars coverage for the Northland suit.

## Conclusion

For the reasons set forth above, exclusions h(1)-(3) provide three separate, independent grounds to release North American from any duty to indemnify or defend CMS in the Northland suit. North American's other grounds for denying coverage, exclusions (g) and (i) and CMS' alleged failure to comply with the reporting requirements, present closer calls for the Court. Because the exclusions discussed above provide sufficient grounds to grant summary judgment in North American's favor, I need not reach the merits of these other grounds for relief.

This Memorandum and Order does not completely dispose of this case. As I mentioned above in footnote two, the Northland suit implicates CMS in two separate medical incidents: one involving Valdez, and one involving Perez, an inmate at a different correctional facility. In the prayer of its complaint, North American seeks a declaration that it has no duty to defend or indemnify CMS in the entire Northland suit. Although I suspect North American intended to limit its complaint to the Valdez matter – as it limited its motion for summary judgment – the face of the complaint and the prayer include all claims in the Northland suit. Thus, any duty that North American may have to defend or indemnify CMS on the Perez-related counts remain undecided, and North American's complaint as it relates to Perez remains pending.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff North American Specialty

Insurance Company's motion for summary judgment [# 46] is granted, and plaintiff

has no duty to defend or indemnify Correctional Medical Services, Inc., or its

nurses, Lorraine Lopez-Moreno, Trina Carrasco, and Jacqueline Cornwell, against

the claims pleaded in Counts I, III, IV, VI, and IX in Northland Ins. Co. v.

Correctional Medical Services, Inc., et al., Case No. CV04-0347 PHX FJM,

pending in the United States District Court for the District of Arizona.

**IT IS FURTHER ORDERED** that defendant's cross motion for partial

summary judgment [# 59] is denied.

**IT IS FURTHER ORDERED** that plaintiff shall inform the Court no later

than **February 2, 2006**, whether it plans to proceed to trial on the Perez-related

counts (Counts II, V, and VII) raised in Northland Ins. Co. v. Correctional Medical

Services, Inc., et al..  If plaintiff dismisses its complaint as to those counts, I will

then enter judgment in accord with this Memorandum and Order.  If it does not do

so, I will expect the parties to file their pretrial submissions by **February 7, 2006**, as previously ordered.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 26th day of <u>January</u>, 2006.